### In re KEEGAN MANAGEMENT CO., SECURITIES LITIGATION.

Michael MOORE, John Vislocky, and Emmanuel Crespo, on behalf of themselves and those similarly situated, Plaintiffs,

v.

KEEGAN MANAGEMENT COMPANY, Keegan Management Co., Worth Corporation, Kenneth Keegan, Jean Perrette, Robert Sharpe, Barry Matthews, Gary Vandeweghe, Harrison Auger, G. Tyler Runnels, Isaac Souede, Robert Wallace, and H.J. Meyers & Co., Inc., Defendants.

Nos. C–91–20084 SW, C–91–20141 SW.

United States District Court, N.D. California.

May 29, 1992.

---

Steven Fineman, Lieff, Cabraser & Heimann, Daniel Harris, Feldman, Waldman & Kline, San Francisco, Cal., for plaintiffs.

Richard Cooper, Freshman, Marantz, Orlanski, Cooper & Klein, Beverly Hills, Cal., Paul Warner, Jeffer, Mangels, Butler & Marmaro, San Francisco, Cal., for defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SPENCER WILLIAMS, District Judge.

Last September, when Defendants moved to dismiss this action, they urged this Court to spare them the expense and burden of discovery, arguing that Plaintiffs had no evidence to support their allegations. Defendants insisted that Plaintiffs were prosecuting this case solely on the basis of a hope that, during discovery, they would uncover some evidence that Defendants had advance warning of the events which ultimately caused Plaintiffs' injury.

Most of Plaintiffs' claims survived the motion to dismiss because Plaintiffs were careful to properly allege every element of each claim they asserted. Consequently, Defendants were not spared the expense and burden of discovery. However, having completed discovery, Defendants now move for summary judgment, arguing that Plaintiffs have been unsuccessful in uncovering any evidence that would justify the further burden and expense of trial. This time, pursuant to Fed.R.Civ.P. 56, the Court agrees.

Accordingly, because Plaintiffs have produced *no* evidence that Defendants' prospectus contained a misrepresentation or omitted a material fact, Defendants' motions for summary judgment are GRANTED. Plaintiffs' motions for summary judgment on their Section 11 of Securities Act of 1933, claims and for class certification of their state law claims are DENIED.

## BACKGROUND

In December 1989, Defendant Keegan Management Company ("Keegan") was the largest franchisee of Nutri/System Weight Loss Centers ("Nutri/System") in the United States, operating some 64 of those centers in the San Francisco Bay Area and other locations. On December 20, 1989, Keegan made an initial public offering ("IPO") of stock, selling 1.25 million shares to its broker-dealer H.J. Meyers & Co. ("Meyers") for $7 per share. Meyers, in turn, resold the shares to the public, pursuant to a prospectus filed on Form S-1 with the Securities and Exchange Commission.

Within months of the IPO, events took a sharp turn for the worse for Keegan. In early 1990, allegations began to emerge that various weight-loss programs, including the Nutri/System program, caused or contributed to gallbladder problems. These allegations were first raised in several personal injury lawsuits filed against Nutri/System in Florida. They subsequently gained nationwide exposure when Congress began a series of hearings relating to the safety of diet plans in March 1990.

Not unexpectedly, Keegan experienced a downturn in client signups. This downturn led to a decline in profits and Keegan's decision in May 1990 to sell 31 of its Nutri/System centers. By August 1990, Keegan was itself a defendant in Nutri/System personal injury lawsuits, and its stock had plunged an average of ten dollars per share.

After suffering substantial losses, Keegan shareholders Michael Moore and John Vislocky filed the first of these two, now consolidated, class action lawsuits in February 1991. Conceding that Defendants disclosed the existence and impact of this negative publicity in April 1990, Plaintiffs charged that Defendants knew, or were reckless in not knowing, about these matters much earlier. Specifically, Plaintiffs alleged that, prior to the IPO, Defendants were aware of information calling into question the safety of the Nutri/System program, but they failed to warn investors in their issuing prospectus of these potential health risks or the potential for personal injury litigation against Keegan.

## DISCUSSION

### I. LEGAL STANDARD ON SUMMARY JUDGMENT

#### A. *Burdens*

The moving party bears "the initial responsibility of informing the district court of the basis for its motion...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The moving party must demonstrate that no genuine issue of material fact exists for trial. *Id.* at 322, 106 S.Ct. at 2552. However, the moving party is not required to *negate* those portions of the nonmoving party's claim on which the nonmoving party bears the burden of proof. *Id.*

Once the moving party demonstrates that there is no genuine issue of material fact, the nonmoving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553. The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

### B. *Evaluating the Evidence*

The adjudication of a summary judgment motion is not a "trial on affidavits." *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Credibility determinations and weighing of the evidence are solely jury functions. *Id.* at 255, 106 S.Ct. at 2513. Inferences drawn from underlying facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

However, there may be no genuine issue of material fact if "the evidence is of insufficient caliber or quantity to allow a rational finder of fact" to find for the nonmoving party. *Anderson,* 477 U.S. at 254, 106 S.Ct. at 2513. And in some circumstances the factual context may render the nonmoving party's claim implausible, and the nonmoving party must come forward with "more persuasive evidence" to support the claim "than would otherwise be necessary." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

### II. ANALYSIS

#### A. *Introduction*

Plaintiffs' entire lawsuit depends upon their allegation that, prior to December 20, 1989, there was (1) information suggesting a link between the Nutri/System diet plan and gallbladder disease, or (2) information indicating that such a link would be alleged in the future, specifically in personal injury lawsuits brought against Keegan-owned Nutri/System centers. If there was no such information, or if the available information would not influence the average prudent investor, then the omission of this information from the prospectus is not actionable under any state or federal law. No law requires the prospectus to contain *im*material information or information that did not exist prior to its effective date.

In reviewing the evidence presented, the Court has taken care not to lose sight of the relevant time frame. The prospectus became effective on December 20, 1989, the date of the IPO. Because all of Plaintiffs' claims are based on the contents of the prospectus, evidence of information available *after* December 20, 1989 is irrelevant to the determination of what should have been stated in the prospectus.

The relevant dates are particularly important in this case because the evidence is undisputed that, by the spring of 1990, there was an abundance of information foretelling a spate of personal injury lawsuits against Keegan as well as a decline in business. Because this information appeared so soon after the IPO, it is tempting to assume, as Plaintiffs do, that Defendants must have had an inkling of it before the IPO. Yet the assumption may not be warranted; on summary judgment, Plaintiffs must produce evidence that it is.

#### B. *The Alleged Misrepresentation*

The only statement in the prospectus which is alleged to be an affirmative misrepresentation is the following:

> The Nutri/System Program combines the three key areas to Safe, Fast, and Effective Weight Loss: Nutrition Counseling, Exercise and Behavior Education and a structured weight maintenance plan. Together, these three elements make up a comprehensive weight loss program.

Prospectus, page 2. According to Plaintiffs, this amounts to a false statement that the Nutri/System diet plan is safe.

Strictly construed, the statement does not assert what Plaintiffs contend; it simply states that the Nutri/System plan contains the elements that are typically found in safe weight loss programs. Nevertheless, the statement is ambiguous, and it certainly *implies* that the Nutri/System diet plan was safe. For this reason, the Court concludes that Plaintiffs may raise a triable issue of fact regarding the accuracy of this statement by producing evidence that the diet plan was *not* safe.

As evidence the Nutri/System plan was safe, Defendants offer the declarations of two medical experts, Robert Baron, M.D., and Paul Broomfield, M.D., who opine that the Nutri/System program poses no health risks, not even to gallbladders. Baron Decl., ¶¶ 7 & 12; Broomfield Decl., ¶ 12. Both of these experts note that there has never been a medical study linking solid food diet plans of 1,000 to 1,200 calories per day to gallstone formation or gallbladder disease. Baron Decl., ¶ 8; Broomfield Decl., ¶ 6.

As evidence that the Nutri/System plan was *un*safe, Plaintiffs offer (1) the declaration of their expert, Jay Marks, M.D. and (2) the testimony, and Nutri/System records, of clients who quit the plan for health reasons.

Dr. Marks' declaration contains the following statement: "I believe that *any* amount of weight loss may lead to gallbladder disease, including weight loss on a program such as the Nutri/System Program." Marks Decl. Opp'n, ¶ 2(c). This particular opinion is not supported by any reference to relevant medical studies or other authority. Apart from this lack of foundation, however, Dr. Marks' opinion today is not relevant to whether such information existed prior to the IPO. In fact, Dr. Marks' deposition testimony indicates that he did not reach this particular opinion until May 1990, five months *after* the IPO. Marks Dep., pp. 185–86.

The rest of Dr. Marks' declaration is simply irrelevant to the Nutri/System program. Dr. Marks lists numerous medical studies, reported prior to the IPO, which, he claims, demonstrate a correlation between weight loss and gallbladder disease. Marks Decl.Supp., ¶¶ 4–6, 8–9. However, he is careful to describe these studies in general terms, without mentioning that they do not involve solid-food diet plans of 1,000 to 1,200 calories per day. All of the studies involved either obese subjects who had undergone gastric bypass surgery or subjects who had experienced rapid weight loss induced by liquid diets of 500 calories or less per day. Marks Dep., pp. 39–40. Despite being directly challenged to do so,

Plaintiffs could not cite any medical study reporting a correlation between gallbladder disease and diet plans of 1,000 to 1,200 calories per day.

There was simply no reason for Defendants, or anybody, to conclude, based on studies of liquid 500–calorie diets, that the Nutri/System solid-food diet plan of 1,000 to 1,200 calories could cause gallbladder disease. To hold otherwise in this situation would lead to absurd results. For instance, based on such reasoning, a car manufacturer would be required to warn that a car is unsafe at 50 miles per hour based solely on studies which showed it to be unsafe at 100 miles per hour. Here Defendants drew the only reasonable conclusion that could be drawn from the studies: weight loss, to be safe, must be carefully controlled so that the dangers of rapid weight loss are avoided. Since the Nutri/System program was a controlled solid-food diet plan of 1,000 to 1,200 calories per day, there was no reason to conclude that the program was unsafe.

Plaintiffs' empirical evidence, consisting of the refund records and deposition testimony of former Nutri/System clients who terminated the program early, fares no better. The number of clients who left the Nutri/System program due to gallbladder disease is simply insignificant when compared to the total number of clients who participated in the program. Plaintiffs have identified only six clients of Keegan-owned Nutri/System centers who notified Keegan that they had gallbladder surgery after participating in the diet plan. On a yearly basis, this averages out to one client in 40,000, or 0.0025%. The incidence of gallstone complaints was similarly low, only four clients in 40,000 per year. Even the total rate of client withdrawal for any medical reason whatsoever was relatively low—approximately 0.4% per year.

The statistics nationwide were no more significant. Although Plaintiffs argue in their brief that "hundreds, if not thousands" of Nutri/System participants informed Nutri/System centers nationwide of their gallbladder problems, the evidence shows only nine such clients out of 950,000

in 1989, or 0.001%, and two such clients out of 585,000 in 1988, or 0.0003%. Compared to the annual percentage of gallbladder removals in the general population of the United States, 0.16%, none of Plaintiffs' empirical evidence is meaningful.

Because neither the medical studies cited by Dr. Marks nor the empirical evidence cited by Plaintiffs could possibly lead one to conclude that the Nutri/System diet plan was unsafe, the Court finds that Plaintiffs have failed to produce evidence of an affirmative misrepresentation in the prospectus. Accordingly, Defendants' motion for summary judgment on Plaintiffs' misrepresentation claims must be GRANTED.

Thus, the inquiry turns to whether Plaintiffs have produced evidence of *material* information, available prior to the IPO, which was *omitted* from the prospectus.

### C. *The Alleged Material Omissions*
#### 1. Plaintiffs' Evidence

Even if the available information indicated that the Nutri/System plan was healthy, Plaintiffs argue that Defendants omitted material information by failing to mention in the prospectus that there were serious *allegations* that the Nutri/System plan was unhealthy. According to Plaintiffs, Defendants should have warned investors that there was a potential for future personal injury litigation and negative publicity. Plaintiffs offer the following evidence of information available prior to the IPO:

(1) the depositions and declarations of several former clients of Keegan-owned Nutri/Systems centers, who state that, prior to the IPO, they suffered gallbladder problems during their participation in the weight loss program;

(2) Keegan's refund and royalty records indicating that, prior to the IPO, many clients were given refunds for various unidentified "medical reasons";

(3) the records of Nutri/System franchisees nationwide, which indicated that, prior to the IPO, many clients informed the plan administrators of their gallbladder problems;

(4) the declaration of Jay Marks, M.D., who states that, at the time of the IPO, there was a host of information, including medical and scientific studies, demonstrating that persons undergoing weight loss, particularly rapid weight loss, were at risk for developing gallstones and requiring gallbladder removal (Marks Decl., ¶¶ 3–10.);

(5) the deposition of Jack Overton, whose testimony suggests that Defendant Kenneth Keegan saw an attorney's advertisement in a legal magazine seeking information to support a correlation between the Nutri/System plan and gallbladder disease;

(6) the declaration of Daniel Harris, who states that he has available for the Court's inspection videotaped copies of a three-part television program aired in Florida, which suggested a link between diet programs and gallbladder disease;

(7) the docket sheet of a case filed in a Maine state court in 1987, in which the Nutri/Systems diet plan was alleged to have caused the plaintiff's gallbladder disease and subsequent surgical removal; and

(8) the deposition of Nutri/System's national medical director, Stuart Shapiro, M.D., who testified that he began collecting articles relating to weight loss and gallbladder disease nearly a year prior to the IPO.

#### 2. The Legal Standard

A material fact is "a fact which if it had been correctly stated or disclosed would have deterred or tended to deter the average prudent investor from purchasing the securities in question." *Escott v. Bar-Chris Construction Corp.*, 283 F.Supp. 643, 681 (S.D.N.Y.1968) (quoting *In Re Charles A. Howard*, 1 S.E.C. 6, 8 (1934)). The question, therefore, is whether disclosure of the above facts, or inferences drawn from them, would have deterred or tended to deter the average prudent inves-

tor from purchasing Keegan's stock. Because the issue of materiality is a mixed question of law and fact, Defendants' motion for summary judgment cannot be granted if reasonable jurors could differ on the answer to this question. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2132–33, 48 L.Ed.2d 757 (1976).

■ In determining whether Plaintiffs' alleged omissions were "material," the Court must do more than determine the materiality of each specific fact listed above. The Court must also determine the materiality of inferences which may properly be drawn from the facts as a whole. For example, the Court cannot simply consider the fact of the Maine lawsuit in isolation. By itself, the existence of one personal injury lawsuit in the entire United States is clearly not a fact that would influence the average prudent investor. The Court must also consider whether the existence of a lawsuit in Maine, when considered with the other facts, leads to an inference which should have been disclosed in the prospectus.

### 3. The Analysis of "Materiality"

■ As discussed above, Plaintiffs' empirical evidence does not lead to an inference that the Nutri/System diet plan causes or contributes to gallbladder disease. At most, this information required Defendants to include a statement that Nutri/System participants occasionally withdraw from the program for medical reasons. In fact, the prospectus contained this very statement. Prospectus, page 16.

Nor does Plaintiffs' empirical evidence lead to an inference that Nutri/System clients were likely to file personal injury lawsuits against Keegan. As noted above, the annual rate of gallbladder problems in the general population is greater than the annual rate demonstrated by Plaintiffs' evidence. Thus, there was no reason for Defendants to expect that those clients who suffered gallbladder problems would blame the Nutri/System diet plan. In fact, none of these clients ever filed personal injury claims against Keegan prior to the IPO.

Also noted above, the declaration of Plaintiffs' expert, Dr. Marks, contains no evidence of information available prior to the IPO suggesting a link between the Nutri/System diet plan and gallbladder disease. The medical studies cited by Dr. Marks involved either liquid diets of 500 calories per day or a peculiar class of obese dieters. These are the same studies collected by Dr. Shapiro, Nutri/System's national medical director. None of these studies has any relevance to the Nutri/System solid-food diet plan of 1,000 to 1,200 calories per day. Furthermore, no-one could predict, based on medical studies of 500–calorie liquid diets, that participants in 1,200–calorie solid-food diets would suffer gallbladder problems and file personal injury lawsuits against their weight-loss counselors. Therefore, since the medical studies cited by Dr. Marks and collected by Dr. Shapiro have no relevance to the Nutri/System plan, this information was immaterial and properly excluded from the prospectus.

The fact that no empirical evidence or medical information suggested a link between the Nutri/System diet plan and gallbladder disease is also relevant to whether Defendants were required to disclose the remaining information cited by Plaintiffs. If there had been one shred of medical authority or empirical evidence suggesting a connection between gallbladder disease and solid-food diet plans of 1,000 to 1,200 calories, a reasonable jury could find that an average prudent investor would be influenced by the existence of a single personal injury lawsuit, a legal advertisement, and a television show. However, absent any real *support* for the connection between gallbladder disease and the Nutri/System program, no prudent investor would change his investment plans solely because, on three isolated occasions, unresolved questions were raised regarding a possible health risk posed by the Nutri/System program.

The average prudent investor is aware that every company faces lawsuits of one type or another. The fact that one Nutri/System client out of nearly a million

filed a lawsuit claiming the diet plan caused his gallbladder problems would not concern the prudent investor, particularly since the out-of-court settlement left no indication whether the client's allegations had any basis in fact.

Similarly, the fact that one plaintiff-side attorney took out an advertisement seeking support for a claim that the Nutri/System plan caused gallbladder problems would not concern the prudent investor. The average prudent investor is aware that many attorneys across the nation seek support for lawsuits which never materialize. The fact that this attorney was forced to advertise nationally for such support would reinforce as much as diminish the prudent investor's confidence that the diet plan was not vulnerable to attack.

Finally, the opinions about Nutri/System expressed in a local television program would not influence the prudent investor in the absence of supporting medical studies or authority. It is common knowledge that the content of television programs is based more on ratings than truth. In any case, the prudent investor would not be concerned about negative publicity generated locally in Florida, since the Keegan Nutri/System centers were located on the west coast.

Based on this Court's finding, as a matter of law, that none of the information cited by Plaintiffs would deter the average prudent investor from investing in Keegan stock, the alleged omissions from the prospectus were not "material," and thus cannot support a legal claim against Defendants. Accordingly, Defendants' motion for summary judgment on Plaintiff's omissions-based claims must be GRANTED.

### 4. Innocent Omissions

■ Even if this Court were to assume that the Maine lawsuit, the Florida television show, and the legal advertisement were facts which would have influenced the average prudent investor, Plaintiffs' claims would not survive summary judgment because there is no evidence that Defendants were aware of this information or that the information was reasonably available to them. Even Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, which provides strict liability against the issuer of stock for *misstatements* in the prospectus, does not impose liability for the omission of material information which was unknown to, and not reasonably discoverable by, the defendants. *See In re The Ultimate Corp. Securities Litigation,* Fed.Sec.L.Rep. (CCH) ¶ 94,523, 1989 WL 86961 (July 20, 1989).

■ In this case, there is no evidence that Defendants saw the tiny five-line classified advertisement which mentioned a claim against Nutri/System for gallbladder disease and sought "similar litigation or claims." This ad appeared in the "Advocate," a publication of the American Trial Lawyers of America. Although Jack Overton testified that he forwarded a copy of this ad to Kenneth Keegan, the dated "Fax Transmittal Memo" indicates that it was not sent until March 21, 1990, well after the IPO. Without evidence that Defendants saw the ad, this Court finds that no reasonable jury would expect Defendants to have found it on their own.

Similarly, there is no evidence that Defendants were aware of the Maine lawsuit or the Florida television program. The Maine lawsuit was not reported in any official reporter or electronic database. The television program was broadcast only in Florida. No reasonable jury could find that such information was reasonably available to Defendants.

Because there is no evidence that Defendants knew of these matters, or could reasonably have discovered them, the law imposes no liability on Defendants for failing to disclose them in the prospectus.

### CONCLUSION

When Plaintiffs' evidence is viewed, not with the benefit of 20–20 hindsight, but with the eyes of the average prudent investor at the time of the IPO, it is clear that Plaintiffs have greatly exaggerated the significance of a few isolated occurrences. No prudent investor, facing the vast amount of information which could possibly bear on her investment decision, would sin-

gle out as noteworthy the information cited by Plaintiffs. No reasonable jury could conclude other than that the average prudent investor would have disregarded these matters, concluding that they were isolated occurrences, which implied nothing about the safety of the Nutri/System diet plan or about the potential for future litigation or negative publicity.

The Court's analysis, which Plaintiffs must have expected, raises a disturbing question: on what evidentiary basis did plaintiffs and their attorneys see fit to file their complaint in the first place? A mere drop in the value of stock is not sufficient. Did Plaintiffs' attorneys view the complaint as a ticket in the discovery lottery, where the odds of discovering real fraud are one-in-fifty, but where one almost always wins a settlement? The Court hopes not.

Fortunately, the summary judgment procedure allows parties to cut through a groundless complaint or untenable defense and thereby eliminate the heavy expense of preparing for trial. This procedure also serves to thwart the practice of prosecuting a case solely in order to obtain a "ransom settlement": one based not on the value of the case, but on the costs of defending it. To achieve these goals, however, the court must peer beyond the hyperbolic arguments of the attorney opposing summary judgment and closely examine the evidence itself. As the above analysis demonstrates, by expending this effort at summary judgment the court can avoid the much greater cost of taking a meritless case to trial.

In this case, because the information cited by Plaintiffs would not have deterred, or tended to deter, the average prudent investor from investing in Keegan stock, Defendants' failure to disclose that information in the prospectus is not actionable under any law. Accordingly, Defendants' motions for summary judgment on all of Plaintiffs' claims must be GRANTED. Because this ruling on the issue of materiality disposes of the entire case, the Court expressly declines to decide whether Defen-

dants' alternative arguments would also entitle them to summary judgment.

IT IS SO ORDERED.