In re KEEGAN MANAGEMENT CO.,
SECURITIES LITIGATION.

Michael MOORE, John Vislocky, and Emanuel Crespo, on behalf of themselves and those similarly situated,

v.

KEEGAN MANAGEMENT COMPANY, Keegan Management Co., Worth Corporation, Kenneth Keegan, Jean Perrette, Robert Sharpe, Barry Matthews, Gary Vandeweghe, Harrison Auger, G. Tyler Runnels, Isaac Souede, Robert Wallace, and H.J. Meyers & Co., Inc., Defendants.

Civ. Nos. 91–20084 SW, 91–20141 SW.

United States District Court,
N.D. California.

March 31, 1994.

Richard L. Jaeger, Feldman Waldman & Kline, Stanley D. Bernstein, Kreindler & Kreindler, New York City, Lieff Cabraser & Heimann, San Francisco, CA, Joseph H. Weiss, Joseph H. Weiss Law Offices, New York City, for Michael Moore, John Vislocky, Elizabeth J. Cabraser, Lieff Cabraser & Heimann.

Richard N. Heimann, Lieff Cabraser & Heimann, San Francisco, CA, for plaintiffs and Cabraser.

Jerome B. Falk, Jr. Special Counsel for Richard Jaeger Howard Rice Nemerovski Canady, Robertson Falk & Rabin, San Francisco, CA.

Gary S. Vandeweghe, Rankin Luckhardt Vandeweghe Landsness & Lahde, San Jose, CA, for Keegan Management Co.

Paul Warner, Patricia S. Brody, Jeffer Mangels Butler & Marmaro, San Francisco, CA, for all defendants.

Richard H. Cooper, Mark A. Klein, Lori A. Fields, Freshman Marantz Orlanski Cooper & Klein, Beverly Hills, CA, for H.J. Meyers & Co. Inc.

## ORDER IMPOSING SANCTIONS

SPENCER WILLIAMS, District Judge.

Plaintiffs brought this class action against Defendant Keegan Management Company and others ("Defendants") alleging that Defendants' prospectus contained a misrepresentation or omitted material facts in violation of federal securities laws. On May 29,

1992, this Court granted Defendants' motion for summary judgment because Plaintiffs were unable to produce evidence sufficient to support their claims. In its Order of May 29, 1992, this Court expressed serious doubts as to whether Plaintiffs had any evidence on which to base this action when it was first filed. *See* Order of May 29, 1992, 18:10–17. Subsequently, the Court advised the parties that it would consider sua sponte whether sanctions are warranted. For the reasons expressed below, the Court concludes that they are.

## BACKGROUND

The following statement of facts is taken from this Court's Order of May 29, 1992, 794 F.Supp. 939, granting Defendants' motion for summary judgment:

In December 1989, Defendant Keegan Management Company ("Keegan") was the largest franchisee of Nutri/System Weight Loss Centers ("Nutri/System") in the United States, operating some 64 of those centers in the San Francisco Bay Area and other locations. On December 20, 1989, Keegan made an initial public offering ("IPO") of stock, selling 1.25 million shares to its broker-dealer H.J. Meyers & Co. ("Meyers") for $7 per share. Meyers, in turn, resold the shares to the public, pursuant to a prospectus filed on Form S–1 with the Securities and Exchange Commission.

Within months of the IPO, events took a sharp turn for the worse for Keegan. In early 1990, allegations began to emerge that various weight loss programs, including the Nutri/System program, caused or contributed to gallbladder problems. These allegations were first raised in several personal injury lawsuits filed against Nutri/System in Florida. They subsequently gained nationwide exposure when Congress began a series of hearings relating to the safety of diet plans in March 1990.

Not unexpectedly, Keegan experienced a downturn in client signups. This downturn led to a decline in profits and Keegan's decision in May 1990 to sell 31 of its Nutri/System centers. By August 1990, Keegan was itself a defendant in Nutri/System personal injury lawsuits, and its stock had plunged an average of ten dollars per share.

After suffering substantial losses, Keegan shareholders Michael Moore and John Vislocky filed the first of these two, now consolidated, class action lawsuits in February 1991. Conceding that Defendants disclosed the existence and impact of this negative publicity in April 1990, Plaintiffs charged that Defendants knew, or were reckless in not knowing, about these matters much earlier. Specifically, Plaintiffs alleged that, prior to the IPO, Defendants were aware of information calling into question the safety of the Nutri/System program, but they failed to warn investors in their issuing prospectus of these potential health risks or the potential for personal injury litigation against Keegan.

On May 29, 1992, this Court granted Defendants' motion for summary judgment because the information that was allegedly omitted from the prospectus was either not "material" or not available to Defendants prior to the initial public offering ("IPO"). Plaintiffs claimed that Defendants knew of or recklessly ignored information suggesting a link between their Nutri/System diet plan and gallbladder disease. On summary judgment however, Plaintiffs produced no evidence that such information was available prior to the IPO. Instead, Plaintiffs produced evidence of only marginally relevant information, which this Court found to be immaterial.

In its conclusion to the Order of May 29, 1992, the Court stated:

The Court's analysis, which Plaintiffs must have expected, raises a disturbing question: on what evidentiary basis did plaintiffs and their attorneys see fit to file their complaint in the first place? A mere drop in the value of stock is not sufficient. Did Plaintiffs' attorneys view the complaint as a ticket in the discovery lottery, where the odds of discovering real fraud are one-in-fifty, but where one almost always wins a settlement? The Court hopes not.

Fortunately, the summary judgment procedure allows parties to cut through a groundless complaint or untenable defense and thereby eliminate the heavy expense of preparing for trial. This procedure also serves to thwart the practice of prosecuting a case solely in order to obtain a "ransom settlement": one based not on the value of the case, but on the costs of

defending it. To achieve these goals, however, the court must peer beyond the hyperbolic arguments of the attorney opposing summary judgment and closely examine the evidence itself. As the above analysis demonstrates, by expending this effort at summary judgment the court can avoid the much greater cost of taking a meritless case to trial.

Order of May 29, 1992, at 946.

Seizing upon this language, Defendants moved for sanctions against Plaintiffs and their attorneys, seeking to recover the $900,-000 they spent defending this matter. However, Defendants withdrew this motion as part of the stipulated dismissal, which this Court approved on March 31, 1993.

## DISCUSSION

### I. LEGAL STANDARD

The Court has several mechanisms available to discipline attorney misconduct: (1) Rule 11 of the Federal Rules of Civil Procedure; (2) 28 U.S.C. § 1927; and (3) its inherent power.

Fed.R.Civ.P. 11 states in pertinent part: The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law, or a good faith argument for the extension, modification or reversal of existing law, and that it is not "interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.[1]

If a pleading, motion of other paper is signed in violation of the rule, the court is required to impose "an appropriate sanction." [2]

■ The court uses an objective reasonableness test to determine whether a Rule 11 violation has occurred. *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 829 (9th Cir.1986). Under this standard, a complaint violates

Rule 11 "if a competent attorney, after reasonable inquiry, could not form a reasonable belief that the complaint was well founded in fact." *Greenberg v. Sala*, 822 F.2d 882, 887 (9th Cir.1987). Stated another way, at the time the complaint is filed, the attorney must possess evidence, direct or circumstantial, sufficient to support a finding that the allegations are reasonably plausible. *See California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1472 (9th Cir.1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

■ A court may also assess sanctions pursuant to 28 U.S.C. § 1927 against any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously...." Although this statutory language implies that it covers conduct taking place during the pendency of an action, it has also been applied to the improper filing of a complaint. *See Lewis v. Brown & Root, Inc.*, 711 F.2d 1287, 1292 (5th Cir.1983), *modified*, 722 F.2d 209 (5th Cir.1984), *cert. denied*, 464 U.S. 1069, 104 S.Ct. 975, 79 L.Ed.2d 213 (1984). Despite the language indicating a "reasonableness" standard, courts have limited awards under 28 U.S.C. § 1927 to cases where the attorney acted recklessly or in bad faith. *United States v. Blodgett*, 709 F.2d 608, 610 (9th Cir.1983). However, unlike Fed.R.Civ.P. 11, a pleading does not have to be entirely frivolous for 28 U.S.C. § 1927 sanctions to attach, so long as a finding of bad faith or recklessness is made. *Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 727 (9th Cir.1984). Sanctions under 28 U.S.C. § 1927 must be imposed on the attorney, not the client. *Zaldivar*, 780 F.2d at 831.

■ Beyond the Court's authority under 28 U.S.C. § 1927, federal courts are vested with the inherent power to impose sanctions for abuse of the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, ——, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991). Using this inherent power, a court may assess attorney's fees "when a party has 'acted in bad

---

1. An amended Rule 11 took effect on December 1, 1993. *See* Fed.R.Civ.P. 11 (West Supp.1993). Since the conduct at issue occurred prior to December 1, 1993, the Court evaluates it under the earlier version of the rule.

2. The amended rule provides that a court may, rather than shall award sanctions in appropriate circumstances.

faith, vexatiously, wantonly, or for oppressive reasons.'" *Id.* at 45–46, 111 S.Ct. at 2133 (quoting *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258–259, 95 S.Ct. 1612, 1622–1623, 44 L.Ed.2d 141 (1975)). A federal court may also use its inherent power to fashion a sanction not contemplated by Fed.R.Civ.P. 11 or 28 U.S.C. § 1927. *See Id.,* 501 U.S. at 46–48, 111 S.Ct. at 2134.

## II. ANALYSIS

▆▆ The question really is: What did Plaintiffs know when they filed their lawsuit? To avoid sanctions, there must be evidence that Plaintiffs knew more than just (1) that the stock dropped and (2) that, several weeks *after* the IPO, allegations surfaced which linked the Nutri/System diet plan to gallbladder disease. This information alone is not sufficient to support Plaintiffs' allegations that Defendants knew of, or recklessly disregarded, this information *prior to* the IPO. Of course, the law does not require plaintiffs to be able to prove their case prior to discovery. However, a complaint must be based on more than pure speculation and fantasy.

▆▆ The fact that Plaintiffs did not prevail at summary judgment does not automatically trigger the imposition of sanctions. *Stitt v. Williams,* 919 F.2d 516, 527–529 (9th Cir.1990). In fact, if, prior to filing the complaint, Plaintiffs had in their possession the same information that they offered in opposition to summary judgment, it would have been sufficient to justify filing this lawsuit. However, Plaintiffs did not obtain this information until after they had filed their now consolidated complaints.

Everything that Plaintiffs knew at the time of filing is listed in pages 3–11 of their brief in opposition to Defendants' motion for sanctions. The Court will review each piece of information to determine whether the information as a whole provided Plaintiffs with a sufficient basis in fact for their lawsuit.

### A. *Evidence*

#### 1. Public Reports and Articles

Plaintiffs' attorneys cite several public reports and articles suggesting a possible link between the Nutri/System diet plan and gallbladder disease: *Lawsuits May Pound Diet Sellers,* Wall Street Journal, March 23, 1990, at B1; *The Risks of Rapid Weight–Loss Programs,* Washington Post, April 3, 1990, at Z17; Wall Street Journal, April 12, 1990 at B8; *Diet Plan's Maker Maps Response; Suits Mounting,* National Law Journal, April 23, 1990, at 3; *Getting Slim,* U.S. News and World Report, May 14, 1990, at 56; *Nutri/System Hit With More Lawsuits,* Boston Globe, June 11, 1990, at 9; Investor's Daily, April 17, 1990, at 28; Connie Chung television program, May 1990. Cabraser Decl. ¶¶ 7, 8a, b, c, d, e, f; Exhs. A, B, C, D, E, F, G, I. Although not one of these articles or reports was available prior to the IPO in December 1989, the March 23, 1990, Wall Street Journal article and the April 3, 1990, Washington Post story refer to an August 1989 study published in the Archives of Internal Medicine, in which researchers concluded that an increased risk of developing gallstones accompanied rapid weight loss dieting. There is no indication, however, that Plaintiffs' counsel read the August 1989 study prior to filing the lawsuit or made any informed determination that its findings were applicable to the Nutri/System diet plan.

#### 2. Congressional Inquiry

Plaintiffs' counsel also cite the congressional inquiry into the safety of the weight loss industry. However, these hearings were held in March and May of 1990. Thus, this information could not have given Plaintiffs reason to think that Defendants knew in December 1989 of the potential for lawsuits and bad publicity.

There was one former Nutri/System client who testified to Congress about gallbladder problems she suffered in June 1989 *prior to* the IPO. Sherri Steinberg testified before a House subcommittee that she believed that the diet plan caused her gallbladder problems. She also testified that she told Nutri/System her suspicions and demanded her money back. Presumably Plaintiffs contend that this single complaint was sufficient to put Defendants on notice of the potential health risks posed by the Nutri/System plan.

However, such isolated complaints are meaningless since gallbladder problems are

bound to arise in some Nutri/System clients just as they arise in the general population. Absent statistically significant numbers, it would be unreasonable for Plaintiffs to infer that Defendants knew of, or recklessly disregarded, the diet plan's potential health risks.

### 3. Personal Injury Attorneys

Plaintiffs' attorneys also claim that they contacted several attorneys who brought personal injury gallbladder lawsuits against Nutri/System *after* December 1989. These personal injury attorneys assured Plaintiffs' attorneys "that prior to December 1989, there was information, in the form of documents, articles in medical journals, and numerous participant complaints to Nutri/System, disclosing an apparent link between gallbladder problems, the Nutri/System program and weight loss in general." Pls.' Mem.P. & A.Opp., at 8; Cabraser Decl., ¶ 11; Jaeger Decl., ¶ 11.

No reasonable attorney could have considered this information sufficient to support the filing of this lawsuit, given its quality and source. Since it consisted of nothing more than assurances from attorneys with an interest in pending litigation involving the company, Plaintiffs' attorneys should have questioned its credibility and reliability. However, there is no indication that Plaintiffs' counsel attempted to verify the information. Indeed, Plaintiffs' counsel admit that they were unable to do so. Cabraser Decl. ¶ 11, Jaeger Decl. ¶ 11. The failure of Plaintiffs' counsel to follow up on the assurances they received is startling in light of the paucity of other evidence to support their allegations.

### 4. One Keegan Client

Plaintiffs' attorneys also note that, prior to filing the complaint, they interviewed one former participant in a Keegan-owned Nutri/System center. This participant suffered gallbladder problems in March 1990, three months after the IPO. Thus, this information could not have provided the required factual basis for Plaintiffs' complaint.

### 5. Marks Declaration

Lastly, Plaintiffs point to the declaration of J.W. Marks, M.D. filed in opposition to Defendants' motion for sanctions to support their insistence that by 1989 there was evidence linking Nutri/System-type weight loss programs with gallbladder disease. Marks' conclusion is based on an October 1975 study published in the Journal of Clinical Investigation, his own study, published in the New England Journal of Medicine in December 1988, and the August 1989 study published in the Archives of Internal Medicine.

However, there is no indication that Plaintiffs' attorneys consulted Dr. Marks or read the literature themselves prior to filing the complaint. Therefore, the Marks Declaration is irrelevant.

### B. *Sufficiency*

■ When looking at what Plaintiffs' attorneys claim they knew prior to filing this lawsuit, one thing is clear—they had no factual basis for inferring that Defendants knew of, or recklessly disregarded, real or alleged health risks posed by the Nutri/System diet plan. Plaintiffs' counsel knew that the stock dropped, and that gallbladder allegations caused the stock to drop. However, they *guessed* that Defendants knew that the diet plan posed significant health risks prior to December 1989. In their zeal to hold Defendants liable for recklessness, Plaintiffs' counsel were themselves reckless in filing the consolidated amended class action complaint as they failed to conduct the type of inquiry demanded by the circumstances described above. Federal courts cannot tolerate complaints grounded solely on metaphysical inferences nor those filed without an informed basis for the allegations. Thus, monetary sanctions are warranted.

■ Having concluded that sanctions are justified, the Court must determine who should be sanctioned. Under Rule 11, a court may sanction parties as well as attorneys. As to attorneys, only the signing attorney, and not the law firm whose name appeared on the offending pleading, may be held liable. *Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 125, 110 S.Ct. 456, 459, 107 L.Ed.2d 438 (1989). However, where the court has determined that the misconduct was reckless or an abuse of the judicial process, the court may use 28 U.S.C. § 1927 or its inherent power to sanction law firms whose names are listed on the pleading. *Kobleur v. Group Hospitalization*

& *Medical Services, Inc.*, 787 F.Supp. 1444, 1453 (S.D.Ga.1991) (imposing sanctions pursuant to court's inherent power), *aff'd* 954 F.2d 705 (11th Cir.1992); *Brignoli v. Balch Hardy & Scheinman*, 735 F.Supp. 100, 102 (S.D.N.Y.1990) (imposing sanctions under 28 U.S.C. § 1927).

■ In contrast to other types of lawsuits, a class action typically takes on a life of its own, apart from those who comprise the class. Since individual class members have little at stake, lead counsel become the driving force behind such litigation. Given this unique position, it is appropriate that the signatories as well as their law firms share liability. Therefore, pursuant to Fed. R.Civ.P. 11 and 28 U.S.C. § 1927, the Court will impose sanctions on the attorneys who signed the complaint and who acted as lead counsel; and pursuant to 28 U.S.C. § 1927 and by way of its inherent power, the Court will impose sanctions on the firms with whom lead counsel were associated.

■ The only question that remains is the amount of sanctions the Court should assess. Monetary sanctions must be reasonable as well as consistent with the central purpose of Rule 11: to deter baseless filings and dilatory or abusive pretrial tactics. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S.Ct. 2447, 2454, 110 L.Ed.2d 359 (1990); *Golden Eagle Dist. Co. v. Burroughs Corp.*, 801 F.2d 1531, 1536 (9th Cir. 1986); *In re Yagman*, 796 F.2d 1165, 1183 (9th Cir.1986), amended, 803 F.2d 1085 (9th Cir.1986), *cert. denied*, 484 U.S. 963, 108 S.Ct. 450, 98 L.Ed.2d 390 (1987). In determining the amount, the district court must strike a balance that furthers the purpose of the rule without chilling meritorious litigation. *See Cooter & Gell*, 496 U.S. at 393, 110 S.Ct. at 2454; *Hudson v. Moore Business Forms, Inc.*, 836 F.2d 1156, 1159–1160 (9th Cir.1987); *Yagman*, 796 F.2d at 1182. To this end, the court must consider not only the conduct itself, but also the offending party's ability to pay. *Yagman*, 796 F.2d at 1185. These considerations are also relevant in determining the amount of sanctions awarded pursuant to 28 U.S.C. § 1927 and the Court's inherent power.

■ After considering these factors, the Court concludes that sanctions in the amount of $100,000 are warranted. Not only is this amount consistent with the considerations expressed above, it is commensurate with the

egregiousness of the conduct as well as the burden this suit has imposed on Defendants. It should, therefore, ensure that Plaintiffs' counsel are mindful of the consequences of embarking on costly fishing expeditions such as this one in the future. In addition, Plaintiffs' counsel and their law firms are prominent in the San Francisco legal community. None of them demonstrated, much less argued, an inability to pay Defendants' $900,000 demand for sanctions.

The parties entered a stipulated dismissal of this action in which Defendants agreed to withdraw their motion for sanctions. The parties' agreement notwithstanding, the Court remains offended by the conduct of Plaintiffs' counsel. Therefore, sanctions shall be paid to the Court.

### CONCLUSION

In light of the foregoing, the Court ORDERS as follows:

Plaintiffs' counsel, Elizabeth Joan Cabraser and Richard L. Jaeger, and the law firms of Lieff Cabraser & Heimann and Feldman, Waldman & Kline, shall, by April 22, 1994, deposit with the Clerk of the Court in San Jose, California, sanctions in the amount of one hundred thousand dollars ($100,000), apportioned as follows:

| | |
|---|---|
| Elizabeth Joan Cabraser | $25,000 |
| Richard L. Jaeger | $25,000 |
| Lieff Cabraser & Heimann | $25,000 |
| Feldman, Waldman & Kline | $25,000 |

IT IS SO ORDERED.