William KAPLAN, Administrator of the Estate of Lois Kaplan, on behalf of himself and all others similarly situated; Thomas Devere, Plaintiffs–Appellants,

v.

Freeman ROSE; Errol Payne; Richard Penfil; David Radlinski; Weeden & Co., L.P.; Medstone International, Inc., Defendants–Appellees.

Georgiane KRAMER, on behalf of herself and all others similarly situated, Plaintiffs–Appellants,

v.

Freeman ROSE; Medstone International, Inc.; Errol Payne; Richard Penfil; David Radlinski; Weeden & Co., L.P., Defendants–Appellees.

Nos. 92–55879, 92–56055.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 1, 1994.

Decided Oct. 11, 1994.

Rehearing Denied Feb. 9, 1995.

Leonard B. Simon, Milberg Weiss Bershad Specthrie & Lerach, Edward M. Gergosian, Barrack, Rudos & Racine, San Diego, CA, for plaintiffs-appellants.

Paul L. Gale and Darryl S. Gibson, Stradling, Yocca, Carlson & Rauth, Newport Beach, CA, for defendant-appellee Freeman Rose.

Robert E. Currie, Latham & Watkins, Costa Mesa, CA, for other defendants-appellees.

Before: BROWNING, BOOCHEVER, and KLEINFELD, Circuit Judges.

BOOCHEVER, Circuit Judge:

William Kaplan appeals the district court's grant of summary judgment to the defendants in his class action alleging securities violations against Medstone International, Inc., various Medstone officers and directors, and an underwriter (hereinafter collectively referred to as "Medstone," or "the defendants," unless individual identification is required). Georgiane Kramer appeals the dismissal as res judicata of her similar class action against the same defendants.

Kaplan alleged that the defendants made numerous material false and misleading statements and omitted material information in the company's prospectus, in violation of § 11 of the Securities Act of 1933. He also alleged that the defendants made false and misleading statements, and omitted material information, from statements made after the prospectus on which the plaintiffs relied in purchasing shares of Medstone stock, in violation of § 10(b) of the Securities and Exchange Act of 1934. Medstone and Kaplan both moved for summary judgment. The district court granted Medstone's motions, finding that the prospectus statements were not false, that Kaplan had not shown reliance on the statements made after the prospectus, and that the defendants had not acted with scienter in making the post-prospectus statements.

On this appeal, the parties dispute which statements and omissions were properly before the district court on summary judgment. Kaplan also argues that there were material issues of fact whether the statements and omissions were false or misleading, whether the plaintiffs relied on the post-prospectus statements under the "fraud on the market" theory, and whether the defendants made the post-prospectus statements with scienter.

The parties also dispute the secondary liability of Medstone's chief executive officer as a "controlling person." We reverse in part and affirm in part.

## FACTS AND PROCEDURAL BACKGROUND

In 1984, Medstone International, Inc. began engineering, manufacturing, and marketing a shockwave lithotripsy system ("system") for the treatment of kidney stones. Lithotripsy treats kidney stones with soundwaves, disintegrating the stones without invasive surgery. In January 1988, the Food and Drug Administration ("FDA") granted Medstone permission to begin clinical studies to test its system for the treatment of gallstones. Medstone began clinical evaluations. In April 1988, the FDA granted Medstone approval to sell its system to treat kidney stones.

In June 1988, Medstone issued its initial public offering. Medstone's prospectus stated that the Medstone system compared favorably with other lithotripters offered by competitors, that the system had been used successfully to treat kidney stone patients since 1986 and gallstone patients since January 1988, and that Medstone's marketing plan was based on its belief that 2,000 lithotripters would be installed in the United States in the next five to ten years to treat kidney stone and gallstone patients. Following the public offering, Medstone sold 1.15 million shares of its common stock at $13 per share.

In the year following the offering, Medstone issued a number of statements regarding the prospects of its gallstone lithotripsy system. For example, Medstone represented that its gallstone investigations were proceeding as expected; that the demand for lithotripsy to treat kidney stones and gallstones was on the rise and would result in increased demand for Medstone's system; and that Medstone's future was bright.

The price of Medstone's stock increased steadily following the June 1988 public offering to a high closing bid of almost $40 a share in August 1988. In the fall of 1988, Errol Payne resigned as Medstone's Chief

Executive Officer ("CEO"), and shortly thereafter he and his family sold two-thirds of their stock, for $6.5 million. At about the same time, Richard Penfil, Medstone's President, and his family sold one-fourth of their Medstone stock for approximately $2.4–2.5 million. After Penfil's resignation in August of 1989, Penfil and his family sold the vast majority of their remaining stock for an additional $4.5 million.

By early October 1989, the Medstone stock price had decreased to $15 per share, and it continued to fall to $12 per share by October 18, 1989.

On October 20, 1989, the FDA announced that it would not approve Medstone's application for its system to treat gallstones, because it lacked "reasonable assurance that the device is effective." The FDA also denied the application for gallstone lithotripsy of Medstone's main competitor, the German company Dornier Medizintechnic GmbH ("Dornier"). A week following the October 20, 1989 announcement, the price of Medstone stock fell to as low as $6 per share.

On October 25, 1989, William Kaplan, as administrator of the estate of a Medstone shareholder, filed a shareholder class action against Medstone alleging violations of federal securities law. In addition to Medstone, Kaplan named the following defendants: Payne (Medstone's former CEO); Penfil (Medstone's former president); Freeman Rose (Medstone's Executive Vice President of Engineering at the time of the offering, and Medstone's CEO from July 1988 to July 1990); David Radlinski (Medstone's Vice President of Finance and Chief Financial Officer ("CFO")); and Weeden & Co., L.P. ("Weeden") (the underwriter of Medstone's initial public offering). Kaplan alleged that the defendants made false and misleading statements in the initial public offering on June 2, 1988, and that up until October 20, 1989, the date of the FDA's rejection of Medstone's application for approval of its gallstone lithotripsy system, they issued further misleading statements inflating the prospects for the success of Medstone's system in treating gallstones.

Shortly after Kaplan filed a second amended complaint on August 2, 1990, the district court granted Kaplan's motion for class certification. The deadline to amend the pleadings or join other parties was set at May 13, 1991.

On June 11, 1991, Georgiane Kramer, a member of the class of Medstone shareholders, filed a separate class action securities fraud complaint against the same defendants named in the *Kaplan* action. On October 7, 1991, the district court dismissed the *Kramer* complaint as barred by the statute of limitations, but later reinstated Kramer's claims regarding statements made after the prospectus. On March 17, 1992, Kramer filed a first amended complaint, and shortly thereafter filed a motion for consolidation with *Kaplan*.

Meanwhile, Kaplan filed a motion for summary judgment on his claims regarding statements in the prospectus and a motion for summary adjudication of facts on the claims regarding Medstone's statements after the prospectus. Medstone filed motions for summary judgment on all Kaplan's claims. The district court granted in full Medstone's motions for summary judgment and denied Kaplan's motions. Without ruling on Kramer's motion for consolidation, the district court dismissed *Kramer* as res judicata.

## DISCUSSION

I. *Statements by Medstone properly before the district court on the motions for summary judgment*

A. *The nine statements before the court on summary judgment*

■ We must first determine which of Medstone's statements are properly before us on appeal. Kaplan alleges that the district court improperly granted summary judgment for Medstone on thirteen statements that Kaplan claims were false and misleading. Medstone responds that only three of the alleged misstatements identified by Kaplan on appeal were before the district court on summary judgment, and that the remainder were specifically rejected as late attempts to amend the pleadings. Medstone is wrong. Nine of the thirteen statements

challenged by Kaplan appear in Kaplan's second amended complaint. The remaining four appear in Kramer's original and amended complaints.

Of course, locating these statements somewhere in the pleadings does not answer whether they were properly before the district court on summary judgment, so that we may consider them on this appeal. To preserve his claims regarding these statements for appeal, Kaplan's opposition to Medstone's motions for summary judgment must have informed the district court of the legal or factual reasons why summary judgment was inappropriate. *Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462, 466–67 (9th Cir.1990). *See also In re Worlds of Wonder Sec. Litig.*, 814 F.Supp. 850, 861 n. 8 (N.D.Cal.1993) ("*Worlds of Wonder I*") (where parties "have thrown in the proverbial kitchen sink" with numerous allegations of misleading statements or omissions in complaint, district court addresses only those contentions raised by parties in opposition papers), *aff'd in part*, 35 F.3d 1407 (9th Cir.1994). All the alleged misstatements that Kaplan cites on appeal appear in the parties' motions for summary judgment. The district court expressly refused to consider the four statements which appeared only in the Kramer complaints, and we address them separately below. All but two of the remaining nine statements, contained in Kaplan's second amended complaint, either appeared in Kaplan's opposition papers to Medstone's motions for summary judgment or were addressed directly by the district court in granting summary judgment to Medstone. The two statements that were not quoted in Kaplan's opposition papers or in the district court's opinion appeared in Medstone's motion for summary judgment and were addressed generally in Kaplan's

arguments regarding Medstone's future prospects and sales. On appeal, Kaplan argues that all these statements violated the securities laws. We therefore find none was abandoned on appeal. *Self Directed Placement*, 908 F.2d at 467.

We find that Kaplan included nine of the statements in his complaint, putting Medstone on notice as to those statements; adequately preserved his contentions regarding those nine statements at summary judgment; and properly presented his arguments regarding the statements in his brief on appeal. The first nine statements thus are properly before us.

**B.** *The four additional statements rejected by the district court*

■ Kaplan further argues that the district court erred in failing to consider four other statements which Kaplan alleged were false in his motion for summary judgment.[1] None of these statements appear in Kaplan's second amended complaint. Instead, two appear in the *Kramer* complaint, filed June 11, 1991, less than a month after the deadline to amend the pleadings in *Kaplan*. By the time the parties filed their motions for summary judgment, the *Kramer* complaint had been dismissed as barred by the statute of limitations.

The other two appear in the amended complaint in *Kramer*, filed March 17, 1992, after Kramer's § 10(b) claims were reinstated, more than four months after the parties submitted motions for summary judgment in *Kaplan*, and more than two months after argument on the summary judgment motions.

Thus at the time the summary judgment motions were filed, these four statements were not before the court in pleadings in

---

1. Those statements are as follows:

Statement 10. In April, 1988, the company won final [renal] approval by the FDA, clearing the way for the sale of 19 lithotripters ... [in 1988]. (March 15, 1989 Los Angeles Times article)

Statement 11. Depending on the size and number of stones, fragmentation rates as high as 97 percent and stone-free results of 90 percent were achieved at six months following treatment. (April 25, 1989 Medstone press release)

Statement 12. Medstone sold its first PMA renal lithotripter after obtaining the PMA in the second quarter of 1988 and since then, such sales have improved dramatically. (November 15, 1988 Weeden Research Report)

Statement 13. The increase in sales revenue principally resulted from the shipments of 19 [lithotripter] Systems during 1988 compared to eight Systems shipped in fiscal 1987, and an increase in the average sales price per System. (Medstone's 1988 Form 10–K)

either *Kaplan* or *Kramer*. The first two were in the initial *Kramer* complaint which already had been dismissed, and the last two, which appeared in the *Kramer* amended complaint, had yet to be alleged at all.

Nevertheless, Kaplan argues that the district court should have considered these four statements. First, he argues that the four statements were "fairly reflected" in his second amended complaint because they were connected to other statements alleged there. Second, he argues that the inclusion of these new statements constituted a motion to amend the complaint under Federal Rule of Civil Procedure 15, the denial of which was an abuse of discretion.

### 1. *"Fairly reflected" in the complaint*

Federal Rule of Civil Procedure 9(b) requires that "the circumstances constituting fraud ... shall be stated with particularity." In a securities fraud action, a pleading is sufficient under Rule 9(b) if it identifies the circumstances of the alleged fraud so that the defendant can prepare an adequate answer. *Wool v. Tandem Computers Inc.,* 818 F.2d 1433, 1439 (9th Cir.1987). The pleadings must state precisely the time, place, and nature of the misleading statements, misrepresentations, and specific acts of fraud. *Id.* at 1439–40. *See also Moore .v. Kayport Package Express, Inc.,* 885 F.2d 531, 540 (9th Cir.1989) ("the allegations should include the misrepresentations themselves with particularity and, where possible, the roles of the individual defendants in the misrepresentations").

The four statements are missing entirely from Kaplan's second amended complaint and, at the time when the motions for summary judgment were filed, were not present in any pleading before the district court, except for Kaplan's summary judgment motion. We therefore conclude that the four statements are not fairly reflected in the complaint. The district court did not err in refusing to consider them. *Id.*

### 2. *Motion to amend*

■ An addition of new issues during the pendency of a summary judgment motion can be treated as a motion for leave to amend the complaint. *Roberts v. Arizona Bd. of Regents,* 661 F.2d 796, 798 n. 1 (9th Cir.1981). A district court's denial of leave to amend is reviewed for an abuse of discretion, keeping in mind the strong policy in favor of allowing amendment, and considering four factors: bad faith, undue delay, prejudice to the opposing party, and the futility of amendment. *DCD Programs, Ltd. v. Leighton,* 833 F.2d 183, 186 (9th Cir.1987).

The district court found that Medstone would suffer prejudice if Kaplan were allowed to amend the complaint, stating: "The parties have engaged in voluminous and protracted discovery.... Expense, delay, and wear and tear on individuals and companies count toward prejudice." Trial was only two months away, and discovery was completed. *See Texaco, Inc. v. Ponsoldt,* 939 F.2d 794, 799 (9th Cir.1991) (no amendment allowed where defendant "would have been unreasonably prejudiced by the addition of numerous claims so close to trial, regardless of [plaintiff's] argument that they were 'implicit' in the previously pleaded claims"). Further, Kaplan had already amended the complaint twice, and "a district court's discretion over amendments is especially broad 'where the court has already given a plaintiff one or more opportunities to amend his complaint.'" *DCD Programs,* 833 F.2d at 186 n. 3 (quoting *Mir v. Fosburg,* 646 F.2d 342, 347 (9th Cir. 1980)). Finally, two documents containing two of the statements were known to Kaplan from the beginning of the litigation, as evidenced by his complaint, which quotes from different portions of them both. Kaplan offers no evidence that he was unaware of the sources of the other two statements. "[L]ate amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action." *Acri v. International Ass'n of Machinists,* 781 F.2d 1393, 1398 (9th Cir.), *cert. denied,* 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 29 (1986). The district court did not abuse its discretion in refusing to consider the new allegations.

We therefore hold that the district court properly excluded Statements 10–13.

II. *Kaplan's § 11 claims*

Kaplan alleges that Statements 1–3 in Medstone's registration statement were material, false, and misleading, and that the statements omitted material information about the success of and market for Medstone's system.

Under § 11 of the Securities Act of 1933, anyone who buys a security pursuant to a false and misleading registration statement may sue for damages. Section 11 states that any signer of the registration statement, any partner or director of the issuer, any professional involved in preparing or certifying the statement, and any underwriter of a registration statement may be liable "[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading...." 15 U.S.C. § 77k (1988).

■ The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment. *See In re VeriFone Sec. Litig.*, 11 F.3d 865, 868–69 (9th Cir.1993). *See also In re Keegan Management Co. Sec. Litig.*, 794 F.Supp. 939, 944 (N.D.Cal.1992) (misstatement is material if correct disclosure would have deterred, or tended to deter, the average prudent investor from buying the offered securities). *Cf.* 17 C.F.R. § 230.405 (information is material if reasonable investor would attach importance to it in considering whether to purchase securities).

■ No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983). Defendants other than the issuer can establish a "due diligence" defense if they show that after reasonable investigation they had reasonable ground to believe (and did believe) that, at the time the registration statement became effective, the statements were true and there was no material omission. 15 U.S.C. § 77k(b)(3)(A).

Three of the nine misstatements alleged by Kaplan appear in Medstone's June 2, 1988, Registration Statement. The defendants potentially liable under § 11 are Medstone, as the issuer; Payne and Penfil, as directors and signatories; Radlinski, as a signatory; and Weeden, as the underwriter. The district court granted summary judgment in favor of the defendants on Statements 2 and 3 without mentioning Statement 1, although Statement 1 appears in Medstone's motion for summary judgment, Kaplan's opposition, and Medstone's reply, and Kaplan raises and discusses this statement on appeal. Statement 1 was fully briefed in the district court and is fully argued before us. Because we review a grant of summary judgment de novo, *Jones v. Union Pac. R.R. Co.*, 968 F.2d 937, 940 (9th Cir.1992), we consider all three statements.

A. *Misrepresentation*

■ Kaplan alleges that Statements 1–3 were false and misleading.

1. *Statement 1:* The Company believes the Medstone System compares favorably with other lithotripters presently being offered by competitors with respect to the precision of its imaging system ... and its success rate in treating patients.

Kaplan argues that this statement was misleading because on June 2, 1988, the date of the offering, the clinical trials of Medstone's gallstone lithotripsy system could not be considered successful. Kaplan relies on a May 4, 1988 memorandum from Josh Burke, Medstone's Vice President of Regulatory Affairs, in which Burke presents a "brief, preliminary summary of data obtained from the first phase of the gallstone study at Baylor University." That memorandum states that five of 27 patients, or 18.5%, showed significant fragmentation of their gallstones (to fragments less than or equal to three millimeters) within 24 hours of treatment with the Medstone system. Those patients were classified as "successes."

Kaplan contends that this "dismal" success rate was misleadingly characterized as comparing favorably with Medstones' competitors' rates of success, and "could mislead potential investors by portraying that Medstone possessed a device that would be well received in the marketplace." Kaplan relies on a February 1988 New England Journal of Medicine article about a German test using a Dornier lithotripter on gallstone patients. Medstone submitted the article as an exhibit in support of its motions for summary judgment. The German study showed that 139 of 175 patients, or almost 80%, had no stones or had significant fragmentation (also to fragments less than or equal to three millimeters) within 24 hours of treatment. Kaplan argues that it was at least misleading to state that the Medstone system, with a 24–hour "success" rate of 18.5%, "compares favorably" to Dornier's system, with its 80% "success" rate.

Medstone responds by claiming that the German success rate cannot be compared to Medstone's, because the patients in the German study had undergone six months of lithotripsy. That is simply wrong. The German study reported that "*one day* after the first shock-wave treatment," of 175 patients two had no stones and 137 had small fragments (emphasis added). At between four and eight months, 63% of all patients in the German study had no stones at all. Contrary to Medstone's statement that "plaintiffs have submitted no evidence that Medstone's 18.5% success rate after just 24 hours of treatment compared poorly to the success rate achieved by the German studies for a comparable time period," there was material evidence to that effect in the article showing the German success rate of 80% after 24 hours.

We find there is a genuine issue of material fact whether Statement 1 was misleading.

2. *Statement 2:* The Medstone [lithotripsy system] has been used successfully to treat kidney stone patients since October 1986 and gallstone patients since January 1988.

■ Kaplan argues that because clinical trials of the Medstone system on gallstone patients had failed to achieve a significant or competitive level of success, it was false and misleading to state that the system had been "used successfully to treat ... gallstone patients since January 1988," when the clinical trials began. As explained above, Medstone's system had achieved a success rate of 18.5% at the time of the prospectus statement, while the system of its competitor Dornier had a success rate of 80%.

Medstone replies that this statement was not literally false because one patient was stone-free in 36 hours, and 18.5% had significant fragmentation in 24 hours. The system was thus "used successfully" on this limited group of patients. Nevertheless, while it is literally true that some gallstone patients were treated successfully by the Medstone system, a material issue of fact remains whether Medstone misleadingly represented that the system was being used successfully on a regular basis, especially given the much higher success rate of the German machine. *See McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) (statement that is literally true may be considered material misrepresentation if misleading in context), *cert. denied*, 501 U.S. 1249, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991).

■ We find there is a genuine issue of material fact whether Statement 2 was false or misleading.

3. *Statement 3:* The Company's marketing plan is based upon its belief that within the next five to ten years there will be a total of approximately 2,000 lithotripters installed in the United States which will be used to treat kidney stone and gallstone patients.

Kaplan argues that this statement was misleading because it implies that Medstone would have a significant share of the lithotripter market. Kaplan also argues that Medstone knew the lithotripter market was saturated, relying on a September 1988 document in which Freeman Rose, then Medstone's CEO, wrote of the kidney machine market: "It's dead." Kaplan also points to Medstone's sluggish sales in 1988, and claims that Medstone knew it would not participate

in any future market because of its system's low success rate with gallstone patients.

Medstone responds that there is no evidence that the market was saturated at the time the prospectus was circulated in June 1988. Medstone points to an independent study prepared as part of Weeden's two due diligence investigations, as the source of the projection of 2,000 installed lithotripters. Medstone also points out that Rose's "It's dead" statement was made three months after the date of the prospectus, and that the statement applied only to the market for single-purpose kidney lithotripsy systems. Rose testified at his deposition that the lack of demand for single-purpose machines gave Medstone's dual-purpose (kidney and gallstone) machine a competitive advantage. Finally, Medstone again asserts that the clinical trials were successful.

A statement in a prospectus will be grounds for liability under § 11 only if it was false or misleading at the time that the registration statement became effective. *See* 15 U.S.C. § 77k(a). Rose's "It's dead" statement was made three months after the prospectus was issued; it thus is not evidence to support a § 11 claim. *See Keegan Management*, 794 F.Supp. at 942 ("Because this information appeared so soon after the [public offering], it is tempting to assume, as Plaintiffs do, that Defendants must have had an inkling of it before the [public offering]. Yet the assumption may not be warranted; on summary judgment, Plaintiffs must produce evidence that it is."). Medstone also provided market figures to show that a substantial number of lithotripters were sold between 1988 and 1991, as evidence that the market was not actually saturated.

Finally, there is a basic flaw in Kaplan's argument. Statement 3 is not a prediction of Medstone's market but a general statement about the entire market for lithotripters. The success of Medstone's clinical trials thus has no direct relevance to this market estimate.

We conclude that there was no genuine issue of material fact regarding whether the market projection of 2,000 machines was false at the time that the registration statement became effective. Summary judgment in favor of Medstone on Statement 3 was appropriate.[2]

### B. *Materiality*

■ Whether Statements 1 and 2 were material is also a question that should have been left for the jury. We find a rational jury could conclude that reasonable investors, reading these statements in the prospectus, could have been misled about the nature of an investment in Medstone. Such investors might have hesitated to buy Medstone stock if they had known that the success rate of Medstone's system, however preliminary, was far below that of its main competitor in the U.S. market. Reasonable jurors certainly could differ on whether this information might affect the stock-purchasing decision. *See Keegan Management*, 794 F.Supp. at 945.

■ Medstone argues that because its prospectus contained a cautionary statement, its optimistic assessment of the competitiveness and success rate of its system in Statements 1 and 2 is not misleading. In the "Risk Factors" section of the Prospectus, Medstone stated that "To date the System has only been used at one hospital on a limited number of patients. No assurance can be given that the clinical trials for the use of this System in treating patients with gallstones under the IND/IDE [the FDA approval to conduct clinical trials] will be successful." Medstone is not saved by pointing to this statement.

This court recently has adopted the "bespeaks caution" doctrine, which holds that if "'precise cautionary language ... directly addresses itself to future projections, estimates, or forecasts in a prospectus,'" the projections will not give rise to a claim of securities fraud. *In re Worlds of Wonder Sec. Litig. (Worlds of Wonder II )*, 35 F.3d 1407, 1414, 1415 (9th Cir.1994) (quoting *Worlds of Wonder I*, 814 F.Supp. at 858). *See Worlds of Wonder II*, at 1414–15 (citing cases from the First, Second, Fifth, Sixth,

---

2. Because we conclude that there was no evidence that the market estimate was false at the time of the registration statements, we do not address whether Statement 3 was material.

Seventh, and Eighth Circuits adopting the doctrine); *In re Convergent Technologies Sec. Litig.*, 948 F.2d 507, 515 (9th Cir.1991) (applying a similar analysis without explicit reference to the doctrine). We need not apply the doctrine in this case, however, because the cautionary statement quoted by Medstone does not relate directly to Statements 1 and 2. While the statement that no assurance can be given that the clinical trials ultimately will be successful might "bespeak caution" as to the *future* success of clinical trials, *see Worlds of Wonder I*, 814 F.Supp. at 858–59, at least a jury question remains whether it neutralized Medstone's statement that its system *already* had been used successfully and was thus competitive.

We find that there is a genuine issue of fact whether Statements 1 and 2 were material.

### C. *Omission of the study results*

. ■ Kaplan also argues that Medstone had a duty to disclose the results of the Baylor clinical study in the prospectus, given the results detailed in Burke's memorandum. Medstone counters that the clinical data was too speculative and premature. If the failure to disclose the clinical results would have misled the reasonable investor about the nature of an investment in Medstone stock, then the omission was material. *VeriFone*, 11 F.3d at 868–69.

This is a close question. "[S]ilence is not misleading in the absence of a duty to disclose." *In re VeriFone Sec. Litig.*, 784 F.Supp. 1471, 1480 (N.D.Cal.1992), *aff'd*, 11 F.3d 865 (9th Cir.1993). While internal forecasts need not be disclosed, *VeriFone*, 11 F.3d at 869, the scientific evaluation of clinical trials is harder data. Kaplan alleges the omission of "material, actual facts" from which forecasts of success may be derived. *Id.* Although a prospectus should not " 'bury the shareholders in an avalanche of trivial information,' " *Basic Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)), this information was not trivial, as the efficacy

and competitiveness of Medstone's system was essential to the company's performance.

Medstone argues that the study results were preliminary. But Medstone also bases its claim that Statements 1 and 2 were not misleading on the same study, characterizing the results as successful. Having used the study results to justify its prospectus statements, Medstone may not simultaneously claim that the study was too preliminary to disclose.

Viewing the evidence in the light most favorable to Kaplan, we believe the inclusion of the test results might have explained what "successful" use of the Medstone system meant and whether it compared favorably with its competitors. The rate of fragmentation achieved by the Medstone system was well below the German machine's results, and is generally inconsistent with the term "successfully." We believe a reasonable jury could find that the study results might have given a reasonable investor pause. We therefore find there is a genuine issue of fact whether the omission of the study results was material, especially in the light of Medstone's statement that the lithotripter was competitive and had been used successfully.

### D. *Weeden's due diligence defense*

■ Weeden moved for summary judgment on its defense of "due diligence" to the § 11 claims. To prevail on this defense at summary judgment, Weeden would have to show as a matter of law that, at the time of the registration statement, it had reasonable ground to believe and did believe, following a reasonable investigation, that the statements in the registration statement were true, that they omitted no required material fact, and that they contained all material facts necessary to ensure that statements in the registration statement were not misleading. 15 U.S.C. § 77k(b)(3)(A).

The district court noted that material issues of fact. remained on the due diligence defense, although the court granted the defendants' motion for summary judgment on other grounds. Because the district court found that the prospectus statements were not false, it did not decide the motion for summary judgment on Weeden's due dili-

gence defense. Because the defense was not decided below, and is not fully argued to us on appeal, we do not address it here.

Therefore, we reverse the district court's grant of summary judgment on the § 11 claims with respect to Statements 1 and 2; we find that there are genuine issues of material fact as to whether these statements were material and misleading. In addition, we find that there is a genuine issue of fact whether the omission of the study results was material. However, we uphold the district court's determination that there is no genuine issue of material fact as to whether Statement 3 was false, and affirm the grant of summary judgment with respect to that statement. Finally, we decline to address Weeden's due diligence defense.

### III. Kaplan's § 10(b) claims

Kaplan alleges that Medstone violated § 10(b) by making six post-prospectus statements, Statements 4–9, in Medstone's press releases, the Annual Report for 1988, and a research report prepared by Weeden. He also alleges that Statements 1–3 in the prospectus violated § 10(b).

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to use any "manipulative or deceptive device" in connection with the purchase or sale of any security. 15 U.S.C. § 78j(b) (1988). Rule 10b–5, a regulation issued under § 10(b), makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of all the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

A projection or statement of belief is a "factual" misstatement actionable under § 10(b) if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy. In re Wells Fargo Sec. Litig., 12 F.3d 922, 930 (9th Cir.1993), cert. denied, — U.S. —, 115 S.Ct. 295, 130 L.Ed.2d 209 (1994); In re Apple Computer Sec. Litig., 886 F.2d 1109, 1113 (9th Cir.1989), cert. denied, 496 U.S.

943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). A plaintiff under § 10(b) must show reliance on the material misstatement, and scienter (an intent to defraud or deceive). See Hanon v. Dataproducts Corp., 976 F.2d 497, 506–07 (9th Cir.1992).

In a securities fraud action, "[m]ateriality and scienter are both fact-specific issues which should ordinarily be left to the trier of fact," although "summary judgment may be granted in appropriate cases." Apple, 886 F.2d at 1113. To survive summary judgment, a plaintiff in a securities fraud suit must show a genuine issue of material fact regarding a particular statement or statements by the defendant company or its insiders. Id. at 1118.

### A. Post–Prospectus Statements

Statements 4–9 contain optimistic pronouncements regarding Medstone's clinical trials for gallstone lithotripsy (4 and 8), the market demand for Medstone's machines (5, 6, and 9), Medstone's competitive position in the market (4), the volatility in its public stock prices (4), and its future success (6 and 7).

The individual statements are as follows:

Statement 4. There is no fundamental reason for the recent volatility in the company's common stock.... Our gallstone investigations are progressing as expected and our competitive position remains strong. (November 11, 1988 Medstone press release)

Statement 5. We believe noninvasive lithotripsy procedures for the treatment of kidney stones and gallstones will rise from 100,000 in 1987 to at least one million annually in the U.S. by the mid–1990s. This procedural demand should support an installed base, increasing from 200 machines at present, to in excess of 2,000 units in the U.S. alone. (November 15, 1988 Weeden Research Report)

Statement 6. Demand for Medstone lithotripters is strong and growing. (November 15, 1988 Weeden Research Report)

Statement 7. 1988 was an excellent year for Medstone.... We achieved exceptional financial results during the year and believe

our outlook is bright. (1988 Medstone Annual Report)

*Statement 8.* The U.S. Food and Drug Administration (FDA) granted us permission in January 1988 to commence clinical trials to determine the safety and effectiveness of the Medstone STS for the treatment of gallstones. Progress is excellent. (1988 Medstone Annual Report)

*Statement 9.* The financial results for the first quarter were below plan, but we see increased sales activity compared to the fourth quarter of 1988. The market is responding favorably to Medstone's Dual Imaging therapy system. (May 2, 1989, press release)

In granting Medstone's motion for summary judgment, the district court found that Kaplan failed as a matter of law to show reliance on any of the alleged misstatements because any material information Medstone had failed to disclose was made available to the market by other sources. The district court thus found that as a matter of law Medstone had not perpetrated a "fraud on the market." We therefore first discuss the reliance element of the § 10(b) analysis.

### 1. *Reliance*

■ Rather than alleging specifically the class's reliance on the statements in buying Medstone stock, Kaplan brought his claim under the "fraud on the market" theory, endorsed by the Supreme Court in *Basic,* 485 U.S. at 245–49, 108 S.Ct. at 990–93, and described in detail in *Apple,* 886 F.2d at 1113–16. "Under the fraud on the market theory, the plaintiff has the benefit of a presumption that he has indirectly relied on the alleged misstatement, by relying on the integrity of the stock price established by the market." *Apple,* 886 F.2d at 1113–14. Kaplan's claim is that Medstone's alleged misstatements misled the market, the price of the stock responded accordingly, the plaintiff class bought the stock in reliance on the integrity of the price, and the class later lost money when the true state of affairs became clear and the price of Medstone's stock fell.

If, however, the information that defendants are alleged to have withheld from or

misrepresented to the market has entered the market through other channels, the market will not have been misled, and the stock price will reflect the full universe of information, despite the defendants' misrepresentations. *Id.* at 1114. In such a case the element of reliance will not be satisfied, and plaintiffs' claims based on a fraud on the market theory will fail. *Id.* at 1115. ("[I]n a fraud on the market case, the defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources."). The information that the defendants withheld or misrepresented, however, "must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations." *Id.* at 1116.

Because the fraud on the market theory affords § 10(b) plaintiffs a presumption of reliance, Medstone has the burden of producing evidence to rebut the presumption. *Basic,* 485 U.S. at 245, 108 S.Ct. at 990–91; Fed.R.Evid. 301. To succeed at the summary judgment stage, Medstone's evidence must show that no rational jury could find for Kaplan on this issue. *Hanon,* 976 F.2d at 500. Our inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

■ Kaplan alleged that Medstone's optimistic statements 4–9 misled the market and omitted negative information about the success of the clinical trials, the likelihood of FDA approval, the size of the future market for lithotripsy and Medstone's place in the market, and the safety and efficacy of gallstone lithotripsy.

As evidence that the omitted information was conveyed to the market, Medstone submitted sixty articles discussing kidney and gallstone lithotripsy and published during the class period to the district court. Numbers can be deceiving. Only fourteen articles discuss Medstone specifically. An additional eight mention the company only in passing.

Six of the seven articles discussing Medstone's clinical trials are generally positive about the success of the trials, with a few cautionary notes. None predicts the low rate of success actually achieved by Medstone's system. Only one of the seven articles reports less than optimistic data. That single article is a summary of Medstone's clinical study results in the American Journal of Surgery, released one month before the end of the class period, which reported that only 10% of the patients who contacted the researchers ultimately were found eligible for lithotripsy, and that only 36% of those were stone-free after six months. The article concludes that surgical removal of the gall bladder is the "gold standard" of gallstone treatment, and lithotripsy "may or may not replace or sharply curtail surgery." Two articles discuss the much more successful German trials of the Dornier lithotripter on gallstones.

The likelihood of FDA approval is addressed in eight articles, almost all of which assume approval is likely to be granted. Only two articles, from two stock analyst reports in September and October 1989, just before the end of the class period, express serious reservations. These articles warn that FDA approval may be "iffy," and "there is a good chance ... that Medstone will *not* receive panel approval." (emphasis in original).

General market estimates for lithotripters appear in ten articles, again mostly positive. Four articles forecast an eventual 2000 machines in the United States, one projects 400 by 1991, and two are generally optimistic. Only the remaining three, appearing in the two months before the end of the class period in October 1989, acknowledge that the market had leveled off and that Medstone's sales had dropped.

Over twenty general articles discussed the size of the gallstone patient group eligible for lithotripsy in sources including the New England Journal of Medicine (two articles), stock analyst reports, Associated Press and other newswires, the Los Angeles Times, Reader's Digest, medical specialty and business journals, the Denver Post, the Pittsburgh Post Gazette, and USA Today. These articles, however, gave widely varying estimates of the eligible patient group, ranging from 10%–80%, with most in the 20%–30% range.

A smaller group of fourteen articles mentions side effects. Of these, five said side effects were few, two had to do with kidney lithotripsy only, and four report possible kidney damage. Subsequent articles minimized the possibility of serious side effects.

Viewing this evidence in the light most favorable to Kaplan, we conclude that a genuine issue of fact remains whether, during the majority of the class period, cautionary information about the results of Medstone's clinical trials, the likelihood of FDA approval, the size of the lithotripsy market and Medstone's share in it, and the safety and efficacy of gallstone lithotripsy was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance" Medstone's allegedly misleading statements. *Apple*, 886 F.2d at 1116. The information available during all but the very end of the class period was generally optimistic about the success of the clinical trials, the size of the market, the likelihood of FDA approval, and the prospects of gallstone lithotripsy in general and of Medstone in particular. In contrast to the evidence found sufficient for summary judgment in *Apple*, 886 F.2d at 1111–12, 1116, the negative articles Medstone submitted are not as numerous as the "at least" twenty articles from such sources as Business Week and the Wall Street Journal, citing the specific *problems* with a new computer. In fact, a significant number of the Medstone articles came from obscure sources, and only a few mention any specific problems. *See id.* at 1116 (not enough to refute fraud on the market theory where the omitted "information has received only brief mention in a few poorly-circulated or lightly-regarded publications").

We therefore hold that, for most of the class period, Medstone has failed to sustain its burden of establishing that no reasonable jury could find that the market was misled by its statements and omissions. "[T]he total mix of information ... sufficiently gives rise to different interpretations as to whether the representations and/or omissions made by [Medstone] were materially misleading to

the market. The impression that this mix of information conveyed cannot be resolved as a matter of law." *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1262 (4th Cir. 1993) (citation omitted).

We emphasize that we do not hold that Kaplan has established his theory. We find only that Medstone has not eliminated the possibility that a rational jury could find that the alleged misrepresentations and omissions misled the market. Our role is not to weigh the conflicting inferences to be drawn from the articles presented by Medstone. That is a function that is properly left to the finder of fact.[3]

■ The end of the class period presents a different picture. About two months before the October 20, 1989 FDA rejection of Medstone's application (which marks the end of the class period), detailed negative articles began to appear in such major sources as the Los Angeles Times Orange County Edition, the American Journal of Surgery, and two stock analyst reports. In combination, these articles fully apprised the market of Medstone's business problems and falling sales, the limited success of the clinical trials, the small eligible patient group, the possible side effects, and the possibility that FDA approval would not be forthcoming. Kaplan cannot claim that the market was misled after this information became available. We therefore agree with the district court that summary judgment was proper as to claims accruing after the beginning of September 1989, when Medstone's clinical results were published. All of the submitted articles after that time warned of the problems Medstone faced. The pessimistic conclusions in the study report, in conjunction with the Los Angeles Times article detailing Medstone's business problems and the later stock analyst reports predicting FDA rejection, were sufficient as

a matter of law to counter the market effect of Medstone's earlier optimistic statements.

We therefore find that the district court erred in granting Medstone summary judgment on the fraud on the market theory only for claims accruing prior to September 1989. This factual issue is best left to the jury. *See Cooke*, 998 F.2d at 1262 (claims based on fraud on the market theory are fact-specific and generally for the trier of fact to decide). We affirm the district court's grant of summary judgment for claims accruing in the period beginning in September 1989.

### 2. *Scienter*

The district court also granted Medstone summary judgment on the scienter element of the § 10(b) claims, finding that Kaplan failed to produce evidence that the defendants intended to deceive investors.

■ In order to prevail on his § 10(b) claim, Kaplan must establish that the defendants made the allegedly misleading statements and omissions with scienter, "a mental state embracing intent to deceive, manipulate or defraud." *Hanon*, 976 F.2d at 507. Kaplan must show actual knowledge or a recklessness that is only one step down from intent,

> a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir.1990) (en banc) (as amended), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991) (citations and quotations omitted).

---

3. Medstone also argues that Kaplan's argument is contradictory, because the fraud on the market theory assumes an efficient market, and the only way to argue that the 60 articles did not reach the market is to concede that the market was not efficient. We reject this argument. As pointed out above, many of the 60 articles did not contain directly relevant information counterbalancing Medstone's public optimism. Some of the

articles that did contain relevant information appeared in obscure sources. An efficient market will ignore irrelevant articles and articles that did not appear in sufficiently circulated and credible sources. The Supreme Court noted that the ultimate resolution of this question is an issue for trial. *Basic*, 485 U.S. at 249 n. 29, 108 S.Ct. at 992 n. 29 ("[p]roof [that information did not actually reach the market] is a matter for trial").

Medstone moved for summary judgment on the issue of scienter, and submitted sworn declarations from each individual defendant, each testifying that he believed in good faith that his challenged statements (including Statements 4–9) were true. Medstone also submitted declarations regarding actions Medstone took in 1988 and 1989, including moving its operations to a larger facility, hiring more employees, increasing its inventory, and entering into an international distribution agreement in late 1988; an internal memo written in June 1989 regarding a productive meeting with the FDA; and positive statements made by FDA personnel in the spring and summer of 1989, as evidence that Medstone had a good faith belief in the future success of its system.

Kaplan's opposition repeated his allegations that Medstone had made false statements, using as specific examples three statements not even properly before the court on this appeal. Kaplan's opposition incorporates his own motion for summary adjudication on his § 10(b) claims, which asked for summary judgment on the issue of falsity only. He also referred the court to a declaration which was struck on a motion from Medstone.

Without the declaration, this portion of Kaplan's argument boils down to an assertion that "These statements are so false that defendants must have known they were false and must have intended to mislead the public." Such an argument does not suffice to rebut the declarations of good faith made by the defendants. "A plaintiff ... must offer more than conclusory allegations, and if the defendant presents affidavits or other evidence establishing a lack of scienter, the plaintiff must come forward with some affirmative showing." *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir.1984) (per curiam). Kaplan, however, presented affirmative evidence as to several defendants.

### a. *Insider trading*

Kaplan presented evidence that Payne, Medstone's CEO at the time of the public offering, sold two-thirds of his stock in the fall of 1988 for $6.5 million, and Penfil, Med-

stone's president, sold one-fourth of his stock at the same time for $2.4–2.5 million. These sales occurred as soon as was legally possible after the public offering in June 1988. Penfil then sold the rest of his stock for another $4.5 million in August of 1989, just before the publication of Medstone's clinical results. Kaplan alleged that these sales coincided with the anticipation that negative information about Medstone would surface.

 "Insider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter." *Apple*, 886 F.2d at 1117. Payne and Penfil's stock sales, in conjunction with the allegations that they were aware of undisclosed negative information about Medstone, do raise suspicions about their intent, as they are massive sales at times alleged to have been calculated to avoid the negative effects of undisclosed inside information. *See Apple*, 886 F.2d at 1117 (cases basing scienter on insider trades "have involved trades in amounts dramatically out of line with prior trading practices at times calculated to maximize personal benefit from undisclosed inside information").

 Medstone cites *Apple* to support its argument that Payne and Penfil's affidavits providing innocent explanations of their stock sales are sufficient as a matter of law to prove that no scienter existed. Payne explained that he sold the stock in the fall of 1988 after he decided to resign as CEO, to reap the economic rewards for the "significant effort and risk that I had invested in Medstone." Penfil explained that he and his family sold one-fourth of his stock in the fall of 1988 for the same reason as Penfil, and sold the remainder concurrent with his resignation in August of 1989 to ensure his financial security so he could spend more time with his family, and because he feared the possibility of hereditary early cancer.

In *Apple*, this court found that sales consistent with earlier patterns (and in much smaller amounts) did not create a genuine issue of fact regarding scienter in the face of "credible and wholly innocent explanations" for the sales. *Apple*, 886 F.2d at 1117. *Apple* does not apply here, however, for two reasons. First, these sales were not consis-

tent with earlier patterns; they were in large amounts and at sensitive times. Second, Payne's and Penfil's explanations—that they wanted to reap financial benefits for personal reasons—merely beg the question of whether they acted on the basis of undisclosed inside information in order to reap large returns. Penfil's implication that he wanted to retire can even be read to support a finding of his scienter.

> [If defendant's] motivation in selling his stock was to fund retirement activities, plaintiff would doubtless argue that the desire to sell the stock to fund retirement was an incentive for [the defendant] to cause the making of inflationary misstatements. Such an implication would give substance to the contention that the alleged misrepresentations and omissions were deliberate.

*Goldman v. Belden,* 754 F.2d 1059, 1071 (2d Cir.1985).

Viewing the evidence in the light most favorable to Kaplan, we find that the evidence of the stock sales was sufficient to create a genuine issue of material fact as to the scienter of Payne and Penfil, and through them Medstone.

### b. *Good faith affidavits*

▮ Radlinski and Rose's affidavits present a different picture. Radlinski, Medstone's CFO, submitted affidavits stating that to the extent he made or participated in the statements alleged to be misleading in the prospectus and afterwards, he "acted in the good faith belief that each of the statements ... [was] accurate and not misleading." He also stated that as to the statements made after the prospectus "I did not believe I was omitting any material information, and I was not aware of any objective fact contradicting any of the statements." He also pointed out that he owned Medstone stock (he did not say how much) and had never sold any shares.

With his summary judgment motion, Rose (Medstone's CEO after Payne) submitted an affidavit stating that all the statements he made were true at the time and were made in good faith. He also stated that to his knowledge, all the information given to the public was true, and he never directed or induced anyone to make public statements that he knew were false or misleading. He stated that he owned approximately 101,000 shares of Medstone stock throughout the class period, and had never sold any.

Even viewing the evidence in the light most favorable to Kaplan, these affidavits, uncontradicted by any evidence of insider trading or other evidence of scienter, are enough to justify granting Radlinski and Rose summary judgment on the issue of their scienter. *See Worlds of Wonder II,* 35 F.3d at 1425 (affirming summary judgment finding good faith where officers held on to stock during period of decline); *Apple,* 886 F.2d at 1117 (statements of good faith in affidavits were uncontroverted for purposes of summary judgment when there was no evidence of suspicious stock sales); *Bryson v. Royal Business Group,* 763 F.2d 491, 494 (1st Cir.1985) (uncontradicted affidavit by CEO allows summary judgment on scienter).

### c. *Weeden*

▮ Don Hill, the former Director of Corporate Finance of Weeden, also submitted an affidavit regarding Weeden's public statements following the offering. Hill's affidavit describes his reliance on the reports of the Wilkerson Group, a consulting firm, and his good faith in making any public statements about Medstone's market (including Statements 5 and 6, which appeared in a Weeden Research Report of November 15, 1988). He also purchased stock in Medstone just before the FDA denied approval in October 1989.

Hill is not named as an individual defendant, however, and his affidavit of personal good faith does not establish as a matter of law that Weeden lacked scienter. The district court cast some doubt on the reasonableness of Weeden's investigation and mentioned a possible conflict of interest in the context of Weeden's due diligence defense to the § 11 claims. Hill apparently became a member of Medstone's board right after the public offering. Unresolved issues remain regarding the objectivity of Weeden's investigation and Hill's membership on Medstone's

board at a time when Weeden purported to perform objective research. Given the conflicting evidence, this affidavit from a single Weeden officer does not establish Weeden's lack of scienter as a matter of law for its statements after the initial public offering.

### 3. *Falsity*

Because it granted Medstone's summary judgment motion by finding as a matter of law that Medstone had rebutted Kaplan's presumption of reliance and that Kaplan had failed to establish scienter, the district court did not address the falsity of the post-prospectus statements made by Medstone after the initial public offering. The district court did address the falsity of the statements attributed to Rose, Statements 4, 8, and 9, and found they were not false.

We decline to address the falsity of any of the post-prospectus statements. Because we find that Kaplan produced no evidence that Rose or Radlinski had scienter, we find that summary judgment in their favor was appropriate on that ground. Further, as to the other defendants, Medstone's motion for summary judgment argued the issues of materiality and scienter, and the district court based its holding on those issues. On appeal, Medstone does not address the falsity of the post-prospectus statements, claiming that they are not properly before the court. We therefore do not decide the issue of the statements' falsity.

### 4. *Materiality*

In a § 10(b) action, an omitted fact is material if a reasonable investor would have been misled about the nature of an investment in Medstone, *VeriFone,* 11 F.3d at 869, because there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic,* 485 U.S. at 231–32, 108 S.Ct. at 983 (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1986)).

■ The parties' summary judgment papers and the district court's opinion, howev-er, discuss materiality as if it were determined by whether the omitted information were credibly available to the market through other sources. Their discussion combines the fraud on the market theory of establishing reliance with the analysis of an individual statement's materiality. The two inquiries are closely related but not identical. A plaintiff who shows reliance under the theory that the market relied on a misrepresentation or omission must also establish materiality by showing that a reasonable shareholder would consider the misrepresentation or omission important, because it altered the total mix of available information.

The district court thus did not fully address the materiality of Statements 4–9. We therefore do not address it here. We note, however, that this issue is fact-specific and usually left to the fact-finder. *See Basic,* 485 U.S. at 239–41, 108 S.Ct. at 987–89; *TSC Indus.,* 426 U.S. at 450, 96 S.Ct. at 2133 (materiality is mixed question of law and fact generally not properly resolved on summary judgment).

Therefore, as regards Kaplan's § 10(b) claims for Statements 4–9, we find that there is a material issue of fact as to reliance prior to September 1989. Moreover, there are material issues of fact regarding the scienter of Medstone, Payne, Penfil, and Weeden. Thus, we reverse the district court's grant of summary judgment for those defendants prior to September 1989. However, summary judgment was appropriate for any § 10(b) claims after that date. In addition, we affirm summary judgment for Rose and Radlinsky, as there is no genuine issue of material fact regarding their scienter.

### B. *The prospectus statements*

The district court granted summary judgment to Medstone on Kaplan's claim that Statements 1–3 in the prospectus violated § 10(b), finding that Kaplan had failed to show any evidence of scienter. Because we find that Kaplan presented a material question of fact regarding the scienter of Payne, Penfil, and Weeden, and because we find above that there is a material question of fact whether Statements 1 and 2 in the prospectus were false and material, we find that

there is a material question of fact whether Medstone, Payne, Penfil, and Weeden violated § 10(b) in making Statements 1 and 2 in the prospectus.[4]

## IV. *Rose as a control person of Medstone*

Kaplan does not argue on appeal that Freeman Rose is liable under § 11 for false or misleading statements made in the prospectus. (At the time of the offering, Rose was not a director of Medstone, and he did not sign the registration statement.) We hold above that there was no material question of fact concerning Rose's lack of scienter in regard to statements made after the initial public offering, and so summary judgment on Rose's liability under § 10(b) for his own public statements was appropriate.

In addition to the summary judgment rulings on Kaplan's § 11 and § 10(b) claims, Kaplan also appeals the district court's holding that Rose was not secondarily liable for allegedly misleading statements made by the other defendants. Although Rose's position as CEO and his participation in the day-to-day affairs of the company were evidence that he exercised control over the other defendants, the court concluded that Rose was not a "controlling person" subject to liability for the statements of others because Kaplan "ha[d] not provided any evidence to support the contention that Rose was a culpable participant in the violations allegedly perpetrated by the other defendants."

■ Section 20(a) of the 1934 Securities Exchange Act provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (1988).

■ Whether Rose is a controlling person "is an intensely factual question," involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions. *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396–97 (9th Cir.1993). "A director is not automatically liable as a controlling person," although director status is a "red light" to the court. *Id.* (quotations omitted).

Rose was Medstone's CEO and a member of Medstone's board of directors during almost the entire class period. Kaplan also alleged Rose's significant participation in day-to-day activities at Medstone. Although Rose's status as an officer and director may not *per se* establish that he controlled the other defendants, his participation in the daily affairs of a relatively small company such as Medstone suffices to establish a material question of fact whether he was a controlling person. *See id.* Viewing the evidence in the light most favorable to Kaplan, we find that Kaplan alleged enough to survive summary judgment on Rose's status as a controlling person.

Rose relies on a line of cases holding that the plaintiff had the burden of showing that the defendant alleged to be a controlling person did not come within the good faith exception, thus requiring the plaintiff to show that the defendant had been a "culpable, knowing participant" in the misstatements. *See, e.g., Orloff v. Allman*, 819 F.2d 904, 906–07 (9th Cir.1987). By a subsequent en banc decision, however, we have established that it is the alleged controlling person who has the burden of showing that he acted in good faith, and so did not share in the scienter required for liability under § 10(b). *Hollinger*, 914 F.2d at 1575. *See also Arthur*, 994 F.2d at 1398; *San Mateo County Transit Dist. v. Dearman, Fitzgerald and Roberts, Inc.*, 979 F.2d 1356, 1358 (9th Cir.1992). Therefore, once Kaplan has shown a material

---

4. Because the district court did not consider the issue of reliance on Statements 1–3, we do not address it here.

question of fact whether Rose was a controlling person, the burden shifts to Rose to show as a matter of law that he acted in good faith.

Rose has met his burden. To establish his good faith, Rose submitted an affidavit in support of defendants' motion for summary judgment, stating that "[d]uring the time I was employed by Medstone, I never directed or induced anyone to make any public statements on behalf of or regarding Medstone which I knew to be false or misleading." Rose also stated: "To my knowledge, all information released to the public was done entirely in good faith, was supported by fact, and was true." Kaplan points to no evidence disputing Rose's declaration of innocence.

Because an uncontradicted declaration of good faith can establish a lack of scienter, *see Apple*, 886 F.2d at 1117, Rose's uncontroverted statement that he never directed anyone to make statements that he knew to be misleading, and that to his knowledge all the information made public was true, is enough to shield him from secondary liability. Summary judgment was properly granted to Rose under § 20(a).

### V. *Res judicata dismissal of Kramer's action*

Kramer argues that her complaint was improperly dismissed as res judicata, because the *Kramer* complaint contained allegations that did not appear in *Kaplan*. Those allegations were the allegedly misleading Statements 10–13, which Kaplan attempted to add to his complaint at the summary judgment phase. Kramer argues that the district court cannot find that the statements did not appear in *Kaplan* and yet dismiss them as res judicata in *Kramer*.

We need not address this argument. Because we reverse in part the grant of summary judgment to Medstone, the judgment that was the basis for res judicata is reversed. Kramer's § 10(b) claims will thus be reinstated, except to the extent we affirm the district court's grant of summary judgment in favor of Medstone as to all § 10(b) claims against Rose and Radlinski, and in favor of Rose on the claims based on secondary liability.

## CONCLUSION

We find that Statements 1–9 were before the district court on summary judgment, and that the district court did not abuse its discretion in refusing to allow Kaplan to add Statements 10–13 at the summary judgment stage.

We reverse the district court's grant of summary judgment to Medstone, Payne, Penfil, Radlinski, and Weeden on the § 11 claims as to Statements 1 and 2, and on the omission of the study results. We affirm the grant of summary judgment to the same defendants on Statement 3.

Further, we reverse the district court's grant of summary judgment to Medstone, Payne, Penfil, and Weeden on the § 10(b) claims with respect to Statements 4–9 and Statements 1 and 2 in the prospectus. Summary judgment was appropriate, however, for claims accruing after the beginning of September 1989. We affirm the grant of summary judgment to Rose and Radlinski, as there is no genuine issue of fact regarding their scienter.

We affirm summary judgment to Rose on the ground that Rose established a good faith defense to controlling person liability under § 20(a).

Finally, we reverse the district court's dismissal of the *Kramer* action as res judicata to the extent that we reverse the district court's grant of summary judgment to Medstone, Payne, Penfil, and Weeden on the § 10(b) claims.

Neither party is awarded fees or costs on appeal.